UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE APPLICATION
OF THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT FOR THE
PREMISES KNOWN AND DESCRIBED AS
1766 78TH STREET, SECOND FLOOR,
BROOKLYN, NEW YORK, AND ANY
CLOSED CONTAINERS FOUND THEREIN

**TO BE FILED UNDER SEAL**

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT**

Case No. 20-MJ-23

---

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, GIOVANNI BOVE, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 1766 78th Street, Second Floor, Brooklyn, New York, and any closed containers found therein ("SUBJECT PREMISES"), further described in Attachment A for the things described in Attachment B.

2. I am a Task Force Officer with the U.S. Drug Enforcement Administration ("DEA"), and have been since March 18, 2019. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Police Officer with the Jersey City Police Department and have been so employed since July 16, 2012. Prior to my employment with the Jersey City Police Department, I was employed by the Hudson County Corrections Department for approximately three years. I graduated from the Bergen County Police

Academy on October 2, 2009, where I received basic training in narcotics enforcement, including the identification of narcotics, narcotics packaging, and narcotics paraphernalia, as well as in the narcotics laws of the State of New Jersey. I graduated from the Union County Police Academy in December 2012, where I also received basic training in enforcement of the narcotics laws. During my time with the Jersey City Police Department's Street Crime Unit, I conducted numerous narcotics, weapons and gang-related surveillances and investigations. In May 2015, I received advanced narcotics training from the NY/NJ High Intensity Drug Trafficking Area Course presented by the New York Police Department, which addressed the high risk entry of narcotics locations, the identification of narcotics, undercover operations, use of confidential informants, fixed and mobile surveillance, foot surveillance, electronic surveillance, current drug trafficking trends, interview/interrogation techniques, and raid planning. From March 7-11, 2016, I attended the Undercover Narcotics Investigative Training (U.N.I.T.), which addressed the current trends involving the sales and distribution of controlled dangerous substances. I have conducted over 400 narcotics related investigations resulting in over 300 narcotics related arrests. I have participated in the execution of over thirty narcotics-related search warrants, including but not limited to the preparations for search warrants of vehicles, mobile devices, computers, safes, storage units and residences. I am familiar with federal narcotics violations, including violations of Title Title 21, United States Code, Sections 841 and 846.

3. I make this Affidavit based upon my personal knowledge based on my participation in this investigation, including communications with others who have personal knowledge of the events and circumstances described herein; my review of records and

reports relating to the investigation; and information gained through my training and experience.

4.  The information provided below is for the limited purpose of establishing sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on the facts set forth in this Affidavit, there is probable cause to believe that the SUBJECT PREMISES described in Attachment A contains evidence, instrumentalities, evidence, or fruits of criminal activity by YAOYU ZHANG in violations of Title 21, United States Code, Sections 841 and 846 (distribution and possession with intent to distribute controlled substances and conspiracy with intent to distribute controlled substances) (collectively, the "SUBJECT OFFENSES").

5.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## THE SUBJECT PREMISES

6.  The SUBJECT PREMISES is particularly described 1766 78th Street, Second Floor, Brooklyn, New York, and any closed containers found therein.

## PROBABLE CAUSE

7.  For several years, the DEA has been investigating money launderers operating in Queens, Brooklyn and New Jersey. These money launderers receive large amounts of cash — usually in small denominations — from local drug dealers and transmit the money to cartels operating in Mexico.

8.  On or about January 7, 2020, a team of DEA agents was in Bay Ridge, Brooklyn to perform surveillance on a money laundering target.

9. Prior to beginning surveillance, TFO Todd Roth parked and exited his car to get lunch. After eating, he walked back towards his car. On his way back to the car, he noticed a Mercedes SUV parked directly behind his car. In the car, TFO Roth saw two men handling large sums of currency.

10. TFO Roth got back into his car and watched the two men in the car behind him through his rearview mirror. TFO Roth observed one of the men ("Individual-1") exit the Mercedes SUV carrying a noticeably heavy duffel bag and walk towards a Lexus SUV parked across the street.

11. Based on TFO Roth's training and experience, which is confirmed by my own, luxury SUVs are common vehicle among individuals involved in money laundering and narcotics trafficking. It is also common for money launderers and narcotics traffickers to carry large amounts of currency in duffel bags.

12. TFO Roth exited his vehicle and walked towards Individual-1. As Individual-1 opened the trunk of his Lexus SUV, TFO Roth told Individual-1 to stop and asked him for identification. Individual-1 stopped and spoke with TFO Roth. TFO Roth asked Individual-1 if he could look inside the duffel bag, and Individual-1 consented to the search. TFO Roth opened the bag and saw a large amount of small denomination currency in rubber-banded bundles.

13. Based on TFO Roth's training and experience, which is confirmed by my own, this form of packaging is common among narcotics traffickers and money launderers.

14. After finding the currency, TFO Roth looked into the now-open trunk of Individual-1's SUV. In the trunk, TFO Roth observed a large contactor's bag containing a large number of vacuum sealed packages of marijuana.

4

15. At this point, Individual-1 agreed to cooperate with law enforcement. Individual-1 told TFO Roth that the person he was planning to provide the money to was coming to meet him nearby in approximately 15 minutes.

16. Approximately 15 minutes later, YAOYU ZHANG came to the area in a white BMW SUV. When ZHANG exited his car, Individual-1 identified him as the person to whom he was delivering the money.

17. DEA agents stopped ZHANG and asked for his identification. ZHANG provided identification listing his name and listing the SUBJECT PREMISES as his address.

18. ZHANG consented to a search of his car. Inside of his car, DEA agents found a pound of marijuana.

19. Individual-1 informed law enforcement that ZHANG was his supplier for marijuana and that he had met ZHANG twice a week at the same location for approximately three months to purchase dozens of pounds of marijuana at a time and to pay him for the marijuana.

20. Individual-1 further stated that he knew that ZHANG lived nearby and that ZHANG would sometimes come to meet him by car and would sometimes come to meet him by foot. According to Individual-1, it would only take ZHANG approximately 10 minutes to arrive with drugs after they arranged to meet. Individual-1 also stated that ZHANG never allowed Individual-1 to see his residence, which Individual-1 believed was because ZHANG was concerned that he would be robbed.

21. Individual-1 further informed law enforcement that the duffel bag contained approximately $100,000 that he was going to give to ZHANG to pay him for past marijuana sales.

22. DEA agents traveled to the SUBJECT PREMISES and spoke to the landlord and to the resident of the first floor of the building. Both individuals informed DEA agents that ZHANG lived alone on the second floor.

23. Based on my training, experience, participation in other narcotics investigations and discussions with other law enforcement officers experienced in narcotics investigations, I know that those involved in narcotics trafficking commonly use a residence to serve as a base of operation:

   a. It is common for narcotics traffickers to store proceeds at locations where they will have privacy and easy access to such proceeds, such as their residences or businesses.

   b. It is also common for narcotics traffickers to store drugs at locations where they will have privacy and easy access to such proceeds, such as their residences or businesses.

   c. Individuals who engage in narcotics trafficking often maintain books, records, receipts, notes, ledgers, and other papers relating to the procurement, distribution, storage and transportation of controlled substances. These records can include the telephone numbers of customers and sources and the amount of controlled substances distributed to various customers, along with running totals of debts owed by those customers. Based on my training and experience I know that it is common for drug traffickers to maintain these records for significant periods of time, to include several years, for the purpose of knowing what debts are owed to them or what debts they may owe.

    d.    Individuals who engage in narcotics trafficking often possess money counters to count large amounts of currency.

    e.    Individuals who engage in narcotics trafficking often maintain contact information of their criminal associates or co-conspirators, to include names, addresses, telephone numbers, social media account identifiers, or email addresses, in books, papers or electronic records, and often store such information in electronic devices including but not limited to cellular telephones.[1]

24.    Based on my training, experience, participation in other investigations and discussions with other law enforcement agents, I know that individuals involved in narcotics trafficking routinely secrete and store books, records, documents, currency and other items of the sort described in the preceding paragraph, which is incorporated herein by reference, in secure locations like cabinets, storage lockers, safety deposit boxes, suitcases, briefcases, safes, key-lock strong boxes and other types of locked or closed containers in an effort to prevent the discovery or theft of said items. I therefore seek authorization to open any closed items and containers or to seize any such closed items and containers so that they may be opened if tools or other implements are required.

---

[1] These statements are based on my involvement in more than 500 narcotics arrests and over 100 searches of individuals' residences. Throughout my career, I have been involved with only approximately 10 instances where a search of a residence of an individual involved in narcotics trafficking did not result in law enforcement finding evidence such as that listed above.

## CONCLUSION

25. I submit that this Affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A and seize the items described in Attachment B.

WHEREFORE, I respectfully request, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, that a warrant be issued for the SUBJECT PREMISES described herein and in ATTACHMENT A, authorizing the search and seizure of the items listed in ATTACHMENT B.

## REQUEST FOR SEALING

26. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate. Premature disclosure of the contents of this Affidavit and related documents

may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

_____
Giovanni Bove
Task Force Officer,
U.S. Drug Enforcement Administration

Subscribed and sworn to before me on January 7, 2020

_____
HONORABLE SANKET J. BULSARA
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

*Property to be searched*

The property to be searched (the "SUBJECT PREMISES") is described as follows, and includes any locked or closed containers or items stored within. The SUBJECT PREMISES is particularly described as 1766 78th Street, Second Floor, Brooklyn, New York, and any closed containers found therein.

## ATTACHMENT B

*Property to be seized*

The items to be seized from the SUBJECT PREMISES include the following evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846 (distribution and possession with intent to distribute controlled substances, and conspiracy with intent to distribute controlled substances) (collectively, the "SUBJECT OFFENSES") by YAOYU ZHANG, including:

1. Narcotics and/or controlled substances, to include drug residue;

2. Records pertaining to the trafficking, purchase, and sale of narcotics;

3. Equipment and paraphernalia used in the illicit narcotics trafficking industry, including knives, scales, storage bags, wrapping, and glassines;

4. Indicia of occupancy or use of the SUBJECT PREMISES;

5. Books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of narcotics;

6. Books, records, invoices, receipts, and other items evidencing the obtaining, secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money;

7. Proceeds of narcotics transactions, including United States currency, foreign currency, precious metals, jewelry, and financial instruments, including certificates of deposit and stocks and bonds;

8. Money counters;

9. Photographs, including still photographs, slides, negatives, digital images, video tapes, films, undeveloped film and the contents therein, depicting narcotics, associates, possible co-conspirators, and assets;

10. Physical and/or electronic address books, contact lists, and any pagers, cell phones, or smart phones that have the ability to store names, addresses, telephone numbers, pager numbers, fax numbers of co-conspirators, customers, financial institutions, and other individuals or businesses with whom a narcotics trafficking relationship exists;

11. Computer hardware, computer software, external hard drives, cd/DVDs, computer passwords, data security devices, computer related documentation, cameras (including digital and video, as well as DVR and video surveillance equipment), "smart" telephones, cellular phones and other mobile electronic devices, and other electronic storage devices reasonably believed to be used as an instrumentality or containing evidence of such offenses; and

2

12. Safes, key-lock strong boxes, suitcases, containers, traps, and other boxes or instruments secured by combination and/or key locks of various kinds that may contain items described above, as well as the combinations or passwords needed to access such locked containers.